Filed 11/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Marriage of SUSAN and TROY MITCHELL DIAMOND. | B321833 |
| | (Los Angeles County Super. Ct. No. BD593432) |
| SUSAN DIAMOND, Appellant, v. TROY MITCHELL DIAMOND, Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lawrence P. Riff, Judge.  Affirmed.

Susan Diamond, in pro. per.; Blain & Associates and Tony Blain for Appellant.

Stanton Law Corporation, Marian L. Stanton and Harold J. Stanton for Respondent.

_____

Susan Diamond appeals from an order denying her request to set aside the judgment in this marital dissolution proceeding. Susan[1] contends the family court erred in denying her motion to vacate the judgment pursuant to Family Code section 2122, subdivisions (c) and (d),[2] based on duress and mental incapacity during the dissolution proceeding. As the court acknowledged, the Family Code does not define mental incapacity or duress. However, with respect to mental incapacity, we find guidance in Probate Code section 810, which governs an individual's ability to make decisions regarding the person's assets, medical options, and whether to marry, and in Code of Civil Procedure section 372, subdivision (a)(4), which concerns an individual's ability to make decisions regarding an ongoing action or proceeding.

The contexts in which these Probate Code and Code of Civil Procedure provisions operate are analogous to the determination in the family law context whether a person has the mental capacity to participate in and make decisions regarding a dissolution proceeding that will determine, among other things, valuation and distribution of assets, child custody, and child and spousal support. We conclude a person lacks mental capacity within the meaning of section 2122 when the person suffers from a mental deficit that significantly impairs his or her ability to understand and appreciate the nature or consequences of his or her actions or the family law proceeding.

---

[1]     We refer to Susan and Troy Diamond by their first names to avoid confusion.

[2]     Further undesignated statutory references are to the Family Code.

Susan presented evidence she had a mental deficit, but she did not meet her burden to show she was incapable of understanding and appreciating the nature and consequences of not appearing in the dissolution proceeding over a two-year period, including the trial. Nor did she show she was incapable during that period of appearing in court (remotely), responding to discovery, responding to her attorney, or requesting an accommodation from the court. While these tasks may have been difficult for Susan due to her ongoing mental health issues, such difficulty does not rise to the level of mental incapacity.

Nor did Susan make a showing of duress, that is, that her husband Troy intentionally used threats or pressure to induce her not to appear or participate in the dissolution proceeding. We also reject Susan's contention that the family court should have set aside the judgment as inequitable under section 2125. Once six months had passed from the judgment, Susan could only obtain relief from the family law judgment if she established one of the circumstances under section 2122, in this case, mental incapacity or duress. Because she has not met her burden, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Martial Dissolution Proceedings*

Susan and Troy were married in 1992 and separated in 2008. Susan filed a petition for dissolution of marriage on December 19, 2013.[3] Susan and Troy have two daughters, Katherine and Sarah, who were 17 and 13 years old, respectively,

---

[3] Susan filed an earlier petition for dissolution of marriage on September 12, 2008, but it was later abandoned.

3

at the time Susan filed for dissolution. In March 2014 Troy responded to the petition and served discovery requests on Susan.

On May 29, 2014 Susan's attorney requested to be relieved as counsel based on Susan's lack of communication and cooperation. In a supporting declaration, the attorney stated Susan failed to respond to his letters and telephone calls regarding Troy's discovery requests. Susan agreed to come to her lawyer's office on two occasions in late April and early May, but she failed to show up. Susan also failed to respond to a letter requesting she execute a substitution of counsel form. A hearing on the attorney's request was held on July 10, 2014. Susan did not appear, and the request was granted.[4] Susan was self-represented throughout the remainder of the proceeding through trial.

Between July 2014 and the trial in May 2015, Susan made no appearances in the case despite Troy's service by mail of numerous documents, including a motion to compel discovery, notice of an order granting the motion to compel and awarding monetary sanctions to Troy, a request for trial setting, and a notice of trial.

---

[4]     The process server was unable to personally serve Susan with the order granting the attorney's withdrawal. Service was made by mail and by leaving the order at Susan's residence with Rebecca Diaz. During the evidentiary hearing, Susan identified Diaz as her caregiver, while Susan's daughter identified Diaz as the housekeeper and nanny.

4

The matter was called for trial on May 5, 2015. When Susan failed to appear on the day of trial, the family court[5] requested Troy call Susan from the courtroom. Troy called Susan at two different phone numbers, but she did not answer. The court found Susan had been served with the notice of trial and sanctioned her $1,500 for failure to appear.

The trial proceeded uncontested with one day of testimony, and the family court issued its findings of fact and order on June 17, 2015. The court awarded sole legal and physical custody of Sarah to Troy, with whom she had been living exclusively since August 2013. (Katherine was no longer a minor by the time of trial.) The court ordered Susan to pay Troy $724 per month in child support and to reimburse Troy almost $40,000 in child support expenses. The court made findings regarding the character and value of the parties' property and awarded Troy approximately $220,000, including equalization payments and payments to compensate for Troy's separate property in Susan's possession, plus $16,000 in attorneys' fees. The judgment was entered on November 25, 2015. The total amount awarded to Troy, not including child support, was approximately $275,000.

In July 2016 Troy filed a request for order seeking a writ of attachment to enforce the judgment and collect child support arrears, and for an award of attorneys' fees. On August 10, 2016 Susan (represented by counsel and appearing for the first time since late 2013) filed a letter from her doctor, Barry Unger, stating Susan suffered from "severe unstable lumbar discogenic disease with associated neuropathy and recently diagnosed

---

[5]     Judge Colin P. Leis presided over the trial and entered the judgment of dissolution.

5

seizure disorder." Dr. Unger continued, "Because of the instability of [Susan's] medical condition, I think it would be medically unwise for her to participate in any court proceedings for at least the next two to three months." After a hearing on Troy's request for order, at which Susan's request for a continuance was denied, the family court ordered the clerk to sign an interspousal grant deed in favor of Troy and determined Susan owed more than $7,000 in child support arrears, plus interest. In September 2016 Troy filed an application for a writ of execution for amounts owed.

B.     *Susan's First Request To Set Aside the Judgment*

On November 21, 2016 Susan filed a request to set aside portions of the November 2015 judgment based on mistake pursuant to section 2122, subdivision (e). Susan argued Troy made mistakes during the uncontested trial regarding the character and value of certain personal property, including property Susan had inherited and community property in Troy's or Susan's possession, and the down payment on the former family residence. In her supporting declaration, Susan did not offer any explanation for her failure to appear at trial, nor did she claim to have been unaware the case was proceeding in 2014 and 2015.

After a hearing, the family court[6] denied Susan's request to set aside the judgment, finding the request was barred by the disentitlement doctrine, which, as the family court explained, "prevents a party from seeking assistance from the court while that party is in an attitude of contempt to legal orders and

---

[6]     Judge Tamara E. Hall.

6

processes of the courts."[7]  The court further found the judgment was not the result of mistake within the meaning of section 2122, subdivision (e).

Susan appealed from the order denying her motion to set aside the judgment.  We dismissed the appeal as taken from a nonappealable order, reasoning "[t]he issues raised by Susan Diamond's motion to set aside portions of the judgment were the same as would have arisen in an appeal from the judgment," which would have been untimely.  (*Diamond v. Diamond* (Sept. 5, 2017, B283115) [nonpub. opn.].)  The remittitur issued on November 17, 2017.

C.    *Susan's Second Request To Set Aside the Judgment*

On November 21, 2017 Susan filed a second request to set aside the 2015 judgment, this time based on duress and mental incapacity pursuant to section 2122, subdivisions (c) and (d). Susan stated in her supporting declaration, "I had no idea that the Court was proceeding to trial in my case or that a default judgment would be entered against me at any time during 2015 or specifically on November 25, 2015.  I was without any legal representation and was medically incapable of appearing in Court due to poor health, duress and mental incapacity resulting

---

[7]    See *MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277 ("A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state."); *In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 460 (dismissing appeal pursuant to disentitlement doctrine where husband failed to comply with three court orders in the case).

from the abuse and domestic violence against me by my ex-husband, Troy."

Susan explained her health began to seriously deteriorate in August 2013, stating "I lost consciousness due to [a] critically low potassium level and had a serious fall from which I broke my nose in two places, bruised my ribs and had [a] serious head injury." According to Susan, in November 2013 she had a seizure and was diagnosed with a seizure disorder. Further, she had painful and blinding migraines that "continued on a near-daily basis" from August 2013 to mid-2016, when she began receiving medical treatment. She was "terrified to go out in public and petrified that [she would] have another seizure in front of everyone." Susan "did not see or talk with anyone most of the time" because she was "ashamed" and "did not want [her] relatives to know how awful things had become due to [her] bad medical condition." Although her daughters had been living primarily with her after the separation in 2008, they moved in with Troy after her fall in 2013 on what she believed was a temporary basis. However, Troy soon began refusing to let Susan see the children and attempted to prevent Susan from having any contact with Sarah.

Susan declared she was unable to pay her bills, and in early 2014 she stopped opening her mail. In late 2015 Diane Harb, the mother of Susan's neighbor, began routinely checking on Susan. Harb opened some of Susan's mail and discovered Susan's house was going to be auctioned due to unpaid property taxes. In mid-2016 Susan met with an attorney to discuss this case, at which point she learned Troy had (in Susan's view) misrepresented the value of their property and lied to the court. Susan stated that although she is an attorney and had been

licensed in California, she "did not understand how this Default Judgment happened without me being present in Court."

In support of her request to set aside the judgment, Susan submitted declarations from two doctors. Dr. Unger, who specializes in internal medicine, declared he first examined Susan in early 2016 and "she was barely able to walk and was experiencing seizures and migraines." Further testing revealed herniated discs, nerve impingement, and "moderate cerebral atrophy." Susan was prescribed medication for her back pain and seizures in 2016. In April 2017 Susan was prescribed medication for severe anxiety "caused by . . . her divorce case with her ex-husband." Dr. Unger opined Susan would have been "physically and mentally incapable of appearing in any type of court proceeding beginning November 2013 . . . [, including] the period of time during 2015 and, more specifically, on November 25, 2015."

Doctor Barry Halote, a psychologist and neuropathologist with experience in evaluating cognitive issues, submitted a declaration dated October 24, 2017 and a May 9, 2017 report addressed to Susan's lawyer. Dr. Halote stated Susan had been referred to him by her attorney for a mental competency evaluation. Dr. Halote described his interview with Susan in April 2017, noting Susan's "hygiene was appropriate," "she was neatly groomed," and she was "outgoing and social throughout the evaluation." Harb, whom Dr. Halote identified as Susan's caretaker, was present during the interview.

Dr. Halote ordered neuropsychological testing for Susan, which was performed by neuropsychologist John Ayvazian. According to Dr. Ayvazian's testing, Susan scored in the "impaired" range for cognitive impairment on one evaluation and

9

in the "low average range" on a more comprehensive evaluation. Dr. Ayvazian stated Susan's results "do not indicate a significant cognitive impairment but rather a psychological condition . . . . [H]er anxiety and depression are very likely interfering with her ability to perceive and process information across multiple modalities." Dr. Halote concluded based on Susan's history and Dr. Ayvazian's testing that it was "obvious . . . that Ms. Diamond was unable to participate in the legal process in the past. . . . [Her] depression interfered with cognitive functioning, motivation, and ability to take care of activities of daily living."

On January 10, 2018 Troy filed an opposition to Susan's request to set aside the judgment, arguing, among other things, that Susan failed to present evidence she was mentally incapacitated in 2014 and 2015. In his supporting declaration Troy disputed Susan's account of why the children moved out of her home. Troy maintained the girls arrived at his home "with their bags packed" on the night Susan fell and broke her nose in August 2013. Katherine told Troy when they arrived, "Sarah's never to return to that home again." Katherine did not explain why she made the statement, but Troy later learned that Sarah had been repeatedly assaulted by Susan's boyfriend from 2009 to 2013, resulting in several hospitalizations for depression and suicidal ideation. In September 2016, at the urging of Sarah and her therapists, Troy sought and received a restraining order precluding Susan from contacting Sarah.

Katherine, then 21, submitted a declaration corroborating Troy's account that Katherine "[took] Sarah out" of their mother's home in 2013. Katherine continued to see Susan after moving out, visiting her every day after school and on some weekends during 2014. Katherine visited her mother less in 2015 and

10

2016, approximately two or three times per week. During their visits they ran errands, went shopping, watched television, and "just spent time together." Regarding Susan's demeanor in 2014, Katherine stated, "At all times my mother seemed fine; our conversations were normal; she did not appear to be 'out of it' at any time. The house was usually clean and I did not notice anything about her that gave me concern. I did not observe her having any seizures or other behaviors that [gave] me any concern about my mother's mental state or intellect." Katherine stated she did not see anything different or concerning in 2015 about Susan's mental condition or her ability "to act normally" or "comprehend our conversations." Katherine added that Susan appeared unchanged in 2016, and Susan helped Katherine with her "studying difficulties" at college. Katherine stated she did "not want to take any sides" in her parents' divorce.

Sarah, then 17, filed a declaration stating she moved out of her mother's house in 2013 "under very difficult circumstances which I do not want to address in this declaration," but she acknowledged the issues concerned Susan's former boyfriend. Sarah saw Susan twice in 2014—in June at Katherine's high school graduation and on Christmas day. On both occasions, Susan was "coherent." At the graduation, Susan was "attentive to what was going on," and at the Christmas gathering, Susan did not appear "drugged or out of touch with reality." Sarah's last contact with Susan was a telephone conversation in October 2015 during which Sarah confronted Susan about the abuse Sarah had suffered. Susan was "very verbal" during the conversation and repeatedly denied Sarah's account of abuse.

11

D.     *The Hearing on the Request To Set Aside the Judgment*

The family court heard testimony over more than 20 days between March 2019 and October 2021.[8]  Susan testified that Troy had been controlling and abusive throughout their marriage, and when she filed for divorce she was afraid he would harm her.  Her description of her physical and mental state during the relevant time period (2013 to 2015) was generally consistent with her declaration.  After her fall in August 2013, and after the children moved in with Troy around the same time, Susan felt "extreme hopelessness."  She had no friends or family, and Troy would not let her see her children.  She could not work or drive, and she rarely left the house.  Susan attended Katherine's high school graduation in May 2014, but Susan explained "[i]t took every ounce of energy and effort to go there, and I just felt sick to my stomach."  Susan added that during 2014 and 2015 she "was waiting to die."  She stated, "I'm not really aware of anything much that I did in those two years" between November 2013 and August 2015.

Because she was unable to work, Susan could not pay her bills, and she stopped opening her mail.  She did not retrieve her mail from the mailbox because it was a long walk down the driveway and she was scared to be outside by herself.  When Katherine visited her, which Susan stated was about once a

---

[8]     Judge Lawrence P. Riff presided over the hearing and issued the preliminary and final statements of decision.  Prior to hearing testimony, the family court found Susan had cured at least some of her noncompliance with court orders and was no longer in contempt of court.  Accordingly, the court declined to apply the disentitlement doctrine to the pending request for order.

12

month, Katherine would get the mail and leave it in a large trash bag. Susan acknowledged Katherine stated she visited Susan multiple times each week from 2014 to 2016, but Susan was adamant that Katherine did not visit that often, stating she had "proof positive" the 2014 visits were infrequent. Susan accused Troy and his attorney of pressuring Katherine to sign the declaration.

Susan testified that prior to the birth of her children, she worked as a deputy attorney general in the California Attorney General's office for approximately three or four years, working on criminal appeals, and then she went into private practice. She had not practiced law since roughly 2000, and her license to practice law in California had been recently suspended due to her failure to pay child support.

Despite claiming to be incapacitated from 2014 to 2016, Susan confirmed a number of financial transactions she handled during that time, including obtaining a cashier's check to pay Katherine's tuition, writing checks to doctors, cashing checks she received in the mail, selling personal items online, and selling two cars. In October 2015 Susan sold her house to Harb and Harb's husband, and Susan used the proceeds to pay the property taxes she owed. Chad Davis, an employee from an auction house, testified that Susan sold antique firearms to the auction house in April 2014.

Susan testified that in 2014 she believed a settlement had been reached in this case and was being finalized. She recalled her attorney telling her in 2014 that she needed to respond to discovery requests from Troy. However, Susan was too sick to go to the attorney's office and asked him to have his paralegal come to her home to go through her documents. Susan was not

13

concerned when she stopped hearing from the attorney because she believed he was working on the settlement. Susan claimed she did not know the matter was proceeding and that a trial took place in May 2015. It was not until Harb began to go through Susan's mail in August 2016 that Susan realized her attorney had withdrawn from the case. However, Susan admitted she received a copy of the judgment in the mail in early 2016 (on Super Bowl Sunday). She opened the envelope, but she assumed it was a settlement or default judgment that her attorney had prepared, so she "put it to the side" to deal with later. She did not read the document until she met with her new attorney in mid-2016.

Harb testified she got to know Susan in early 2015. Susan was experiencing severe back pain, was having migraines and seizures, and was "filled with grief" because "her daughters were taken from her house." Susan's home was messy, and there was no food in the house. Harb was concerned that Susan was alone and did not have anyone to help her or run errands for her. In the middle of 2015 Harb saw Susan once or twice a month in person. During the summer of 2015 Susan told Harb that she "didn't want to live." However, Harb acknowledged during cross-examination that during 2015 Susan was able to communicate coherently to Harb, and Susan appeared to understand what Harb said to her.

Troy's testimony mainly recounted the statements in his declaration. He described seeing Susan at Katherine's graduation in May 2014 and recalled she was dressed appropriately, was walking without assistance, and did not appear to have any difficulty socializing with his family. Troy's

mother and sister likewise testified Susan was acting normally at Katherine's graduation.

Susan called Drs. Unger, Halote, and Ayvazian as her experts. Dr. Unger testified he began treating Susan in January 2016. She complained of back pain and severe fatigue. She appeared "very stressed, very anxious, somewhat depressed." An MRI showed mild to moderate cerebral atrophy. According to Dr. Unger, "[t]he radiologist who looked at [the MRI] thought it might be compatible with early Alzheimer's, dementia." However, Dr. Unger admitted there was no evidence this condition existed prior to 2016. Dr. Unger opined, based on Susan's condition in 2016 and her account of her medical history, that Susan would not have been able to appear in court from November 2013 through 2015 because "[s]he was in so much pain and so much fatigue, shaking. I don't think she would be capable of really sustained attention."

Dr. Halote testified he performed a mental competency evaluation on Susan in April 2017 by "ask[ing] her numerous questions," speaking with Harb (who accompanied Susan to her appointments), reviewing an MRI, and ordering and reviewing a neuropsychological assessment. Based on this evaluation, Dr. Halote concluded Susan had been mentally incapacitated in 2015. He explained, "Ms. Susan Diamond had severe deficits in activities of daily living, which impacted her ability to function; therefore, she was incapacitated because my definition of incapacity is a severe disruption in activities of daily living." He also stated that in 2015 Susan was "the victim of duress by Mr. Diamond." Dr. Halote defined duress as "the imposition of one person's will onto another person in order to affect that other person's behavior."

Dr. Ayvazian testified regarding the neuropsychological tests he performed on Susan in 2017. He concluded Susan "has dysfunction in terms of attention and concentration and immediate memory but not an overall gross impairment in neuropsychological functioning and that her profile is one of an individual undergoing psychological stress, which would impair their attention and concentration and not . . . some type of dementing disorder or profound neuropsychological disorder." Further, Susan did not have a deficit in executive functioning. Dr. Ayvazian opined Susan was not mentally incapacitated, which he defined as the inability "to make informed and correct decision[s] due to a cognitive disorder."

Troy presented the testimony of forensic psychiatrist Dr. Patrick Wiita, who had training in evaluation of a person's past mental state. Dr. Wiita did not examine Susan but reviewed the declaration and testimony of Dr. Halote. Dr. Wiita testified that Dr. Halote's opinion was unreliable and "fell far below acceptable professional standards." Specifically, Dr. Wiita opined that it was problematic for Dr. Halote to rely primarily on Susan's self-reporting of her condition during the relevant time period instead of collateral information such as medical records or observations from third parties. Dr. Halote also improperly relied on contemporaneous test results to determine Susan's mental state two years earlier. Dr. Wiita explained that evaluations of a person's past mental state typically focused on specific days or short periods of time, adding that other than "a persistent vegetative state, I can't at present think of a condition that I would be comfortable opining on over a period of two years." Finally, mental incapacity is "task specific." Dr. Wiita elaborated, "[T]here is no single diagnosis that renders someone

16

incapacitated. There are people that have severe depression who may be able to do a certain task, and there are people with the same diagnosis that may not be able to do that task."

Dr. Halote's report was deficient in this respect because he relied on a diagnosis of depression and anxiety to show Susan was incapacitated but did not evaluate "her functional ability at the time in question."

E.    *The Statement of Decision*

The family court issued a preliminary statement of decision on April 29, 2022. Neither party objected, and on May 25, 2022 the court adopted the preliminary statement of decision as its final statement of decision and entered an order denying Susan's request to set aside the 2015 judgment.

The 29-page statement of decision contained a thorough recitation of the evidence and clearly set forth the family court's credibility findings and the weight it gave to each expert's opinion. The court observed that section 2122, subdivision (d), did not provide a definition of mental incapacity, and therefore, the court relied on the plain meaning of the phrase "mental incapacity," as well as the definitions used in the Probate, Civil, and Penal Codes. The court defined mental incapacity as "a disease, defect or condition that includes an *inability* to *understand* the underlying events or processes or an *inability* to *carry out activities* in one's rational self-interest."

After reviewing the evidence, the family court stated, "The court does not find credible Susan's testimony concerning the nature and extent of her claimed mental *incapacity* during the 2014–May 2015 period." The court further found the "claims of mental incapacity (and duress) are likely not true or, at most, are extreme exaggerations of Susan's non-incapacitating underlying

17

anxiety and depression conditions." The court pointed out inconsistencies in the testimony of Susan's doctors and found the bases for Dr. Halote's opinion, mainly Susan's own "largely uncorroborated" version of events, was "insufficiently robust." The court concluded, "Susan was depressed, anxious, reclusive and isolated during the period of 2014 to May 2015. But the evidence does not lead the court to find, more likely than not, Susan suffered from mental incapacity in the section 2122 meaning of that term. The court finds that during that interval, Susan understood the nature of the marital dissolution action she had commenced . . . and understood the consequences of not attending court appearances. The court finds that her depression and anxiety during that period did not result in her being incapable of rationally acting . . . ."

With respect to duress, the family court noted that, like mental incapacity, section 2122, subdivision (c), did not define the term. The court looked to contract law and the Civil Code, concluding duress was present when a person "was so afraid or intimidated by the wrongful act or wrongful threat that the [person] did not have the free will to refuse to consent." The court found, applying that definition of duress, "Susan's reliance on the doctrine of duress is misplaced. The case does not present a question whether Susan's agreement on or consent to anything was obtained wrongfully through duress." Further, to the extent duress encompasses the destruction of a person's free agency, "Susan has not carried her burden of proof to establish that Troy's behavior directed at her destroyed her free agency."

Finally, the family court rejected Susan's assertion the 2015 judgment should be set aside as inequitable because, among other reasons, section 2123 prohibits a court from setting aside a

18

judgment solely based on a finding the judgment was or has become inequitable.

## DISCUSSION

A.     *Governing Law and Standard of Review*

When a litigant has waited longer than six months to seek relief from a family law judgment,[9] he or she is limited to the specific grounds for relief contained in section 2122. (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 498-499; *In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 32 (*Marriage of Heggie*).) Section 2122 provides that a motion to set aside a judgment may be based on actual fraud, perjury, duress, mental incapacity, mistake of fact, or failure to comply with disclosure requirements.[10]  (§ 2122, subds. (a)-(f).) Motions to set aside a judgment on the bases of fraud, perjury, mistake, and failure to disclose must be brought within one year of the judgment. (*Id.*, subds. (a), (b), (e), (f).) Motions based on duress and mental incapacity must be brought within two years of the

---

[9]     Within the first six months after a judgment is entered, a party may move to vacate the judgment based on mistake, inadvertence, surprise, or excusable neglect. (Code Civ. Proc., § 473, subd. (b).)

[10]     Section 2122 states, as relevant here: "The grounds and time limits for a motion to set aside a judgment, or any part or parts thereof, are governed by this section and shall be one of the following:  . . . .  [¶]  . . . .  [¶]  (c) Duress. An action or motion based upon duress shall be brought within two years after the date of entry of judgment.  [¶]  (d) Mental incapacity. An action or motion based on mental incapacity shall be brought within two years after the date of entry of judgment."

19

date of the entry of judgment.  (*Id*., subds. (c), (d).)  "[B]efore granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief."  (§ 2121, subd. (b).)

The party moving for relief under section 2122 bears the burden of proving entitlement to relief.  (*In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 88-89 ["burden of proof would rest where it has always rested, with the moving party, when a Family Code section 2122 challenge is made against a judgment entered after trial"].)  We review the family court's ruling under section 2122 for abuse of discretion, which generally requires applying the substantial evidence standard to the family court's factual findings.  (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 146; *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1346.)

However, a different standard applies where, as here, the appellant had the burden of proof in the family court.  "'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' [Citation.]  'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'"  (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978-979; accord, *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

"'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of

such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.""'" (*Juen v. Alain Pinel Realtors, Inc.*, *supra*, 32 Cal.App.5th at p. 979; accord, *Glovis America, Inc. v. County of Ventura* (2018) 28 Cal.App.5th 62, 71; *Dreyer's Grand Ice Cream, Inc. v. County of Kern*, *supra*, 218 Cal.App.4th at p. 838.) "'[W]here . . . the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.'" (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734; accord, *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) "That is because unless the family court makes specific findings of fact in favor of the losing [party], we presume the family court found the [losing party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." (*Bookout*, at p. 1486.)

We review the interpretation of a statute de novo. (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1052; *Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804.) "'Our fundamental task is to ascertain the Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. [Citation.] We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment.'" (*Stone*, at p. 1052; accord, *Niedermeier v. FCA US LLC* (2024) 15 Cal.5th 792, 804.) Further, "every statute should be construed with reference to all other statutes of similar subject so that each part of the law as a whole may be harmonized and given effect.'" (*Landrum v. Superior Court of*

21

*Los Angeles County* (1981) 30 Cal.3d 1, 14; accord, *San Diego County Water Authority v. Metropolitan Water Dist.* (2004) 117 Cal.App.4th 13, 26 ["It is another fundamental rule of statutory construction that 'every statute should be construed with reference to all other statutes of similar subject so that each part of the law as a whole may be harmonized and given effect.'"].)

B.     *The Evidence Did Not Compel a Finding of Mental Incapacity*[11]

As the family court observed, the Family Code does not define mental incapacity for purposes of section 2122 (or for any other purpose).[12]  However, our review of how other statutes

---

[11]     Because we conclude Susan has not met her burden to show the family court erred in denying relief from the judgment pursuant to section 2122, we do not reach her arguments on alleged errors in the judgment.

[12]     The legislative history of section 2122 does not provide insight into the meaning of "mental incapacity."  When Assembly Bill No. 1396 (which added the language that would later become section 2122) was first introduced in 1991, it contained time limits and descriptions for each ground under which a judgment could be set aside.  (See Assem. Bill No. 1396 (1991-1992 Reg. Sess.) as introduced Mar. 7, 1991.)  The Bill stated a judgment could be set aside for "[m]ental incapacity of such severity that the aggrieved party was incapable of exercising reasonable judgment."  (*Id.* at § 2.)  In May 1991 the Assembly Committee of the Judiciary noted the bill was "confusing" as written because it referred to the grounds to set aside a judgment in two different places.  (Assem. Com. on Judiciary, Analysis of Assem. Bill. No. 1396 (1991-1992 Reg. Sess.) May 8, 1991, p. 7.)  The Committee recommended the bill "be amended to clearly set out

22

define the term mental capacity and related terms guides our determination of the appropriate definition to apply under section 2122.  Further, "the determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand." (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 639 (*Marriage of Greenway*).)

The Due Process in Competence Determinations Act (Probate Code, section 810 et seq.; the Act) is particularly helpful as a "basic starting point for any mental capacity determination." (*Marriage of Greenway, supra*, 217 Cal.App.4th at pp. 638-640 [applying standard under Probate Code section 810 to determination in dissolution proceeding whether husband had mental capacity to make a decision whether to dissolve his marriage].)  The Act addresses the capacity of persons with a mental or physical disorder to take a range of actions, including "contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions." (Prob. Code, § 810, subd. (b).)  The Act is commonly applied in the context of determining whether a person had the mental capacity to execute a will or trust document directing distribution of the person's assets.  (See *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545 [applying the Act to determination whether trustor had capacity to execute trust document].)

---

in one place the allowable grounds, their definitions and time limits." (*Ibid.*)  The July 12, 1991 version of the bill as amended in the Assembly left in mental incapacity as a ground to set aside a judgment but removed the language defining mental incapacity.  (See Assem. Amend. to Bill No. 1396 (1991-1992 Reg. Sess.) July 12, 1991.)

Probate Code section 810, subdivision (a), establishes a rebuttable presumption that all persons have the capacity to make decisions and to be responsible for their acts or decisions. Consistent with this presumption, under subdivision (c), a determination that a person "suffers from one or more mental deficits so substantial that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act, should be based on evidence of a deficit in one or more of the person's mental functions rather than on a diagnosis of a person's mental or physical disorder." (*Id.*, subd. (c).)

Probate Code section 811, subdivision (a), enumerates 18 mental functions relevant to a determination whether a person lacks the capacity to make a decision or do a certain act, which determination "shall be supported by evidence of a deficit in at least one of the following mental functions." The mental functions include orientation to time, place, person, and situation; ability to attend and concentrate; short- and long-term memory; ability to understand and communicate with others; ability to plan, organize, and carry out actions in one's own rational self-interest; ability to reason logically; and presence of a pervasive and persistent or recurrent state of anxiety, fear, panic, depression, hopelessness or despair, or helplessness that is inappropriate in degree to the individual's circumstances. (*Ibid.*) As relevant here, even if one of the listed deficits is found, it "may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (*Id.*, subd. (b).)

Code of Civil Procedure section 372, which governs appointment of guardians ad litem, similar to the Probate Code, defines "a person who lacks legal capacity to make decisions" to include "[a] person who lacks capacity to understand the nature or consequences of the action or proceeding" and "[a] person who lacks capacity to assist the person's attorney in the preparation of a case." (Code Civ. Proc., § 372, subd. (a)(4)A).)[13]

In the context of the ability to contract, the Civil Code establishes a rebuttable presumption that a person is of "unsound mind . . . if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence. Substantial inability may not be proved solely by isolated incidents of negligence or improvidence." (Civ. Code, § 39, subd. (b).)

We conclude the most analogous circumstances to those under Family Code section 2122—to determine whether a person had the mental capacity to participate in and make decisions regarding a dissolution proceeding (which will determine, among other things, valuation and distribution of assets, child custody, and child and spousal support)—are those governed by Probate Code section 810 and Code of Civil Procedure section 372, subdivision (a)(4). These statutes concern an individual's ability to make decisions regarding the person's assets, medical options, and whether to marry (the Probate Code) or to make decisions

---

[13] Similarly, under the Penal Code, a defendant will be found "mentally incompetent" where, "as the result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).)

25

regarding an ongoing action or proceeding (the Code of Civil Procedure). The decision here whether to appear in the dissolution proceeding, including whether to respond to discovery, show up at scheduled hearings, respond to an attorney, or to request from the court an accommodation if needed, do not require the complex decision-making involved in entering into a contract. (See *Marriage of Greenway, supra,* 217 Cal.App.4th at p. 643 ["contractual decisions create rights, duties, and responsibilities that require a higher level of understanding and appreciation, and the parties are not afforded the same safety net of laws that protect parties to marriage contracts or testamentary acts"].)

Applying the standards for mental incapacity in the Probate and Civil Codes, we conclude a person lacks mental capacity within the meaning of section 2122 when the person suffers from a mental deficit that significantly impairs his or her ability to understand and appreciate the nature or consequences of his or her actions or of the family law proceeding.

As a threshold matter, we defer to the family court's finding that Susan "was likely depressed and anxious," two mental deficits under Probate Code section 811, subdivision (a). But significantly, Susan undertook multiple actions during the relevant time period that required planning, organization, and communication with others, including selling her home and using the proceeds to pay her property taxes; obtaining a cashier's check and using it to pay Katherine's tuition; writing and cashing checks; and selling two cars, antique firearms, and personal items. Susan has not argued she was unable to understand these transactions or their consequences. It is also undisputed that Susan was able to leave her home, at least occasionally (for

26

Katherine's graduation and shopping and running errands with Katherine), and she was coherent and aware during her interactions with Harb and others.

With respect to the dissolution trial, Susan testified she understood the dissolution action was proceeding, but she believed it was a proceeding for finalization of a settlement, not a trial.[14] She also admitted she had received a copy of the judgment in the mail in early 2016 (well within the six-month period in which she could have contested it under Code of Civil Procedure, section 473, subdivision (b)), but she made the decision not to read it until months later. None of this evidence compels a finding that Susan was unable to understand and appreciate the consequences of her failure to participate in the dissolution proceeding, particularly in light of her years as a practicing attorney. Although Susan testified she was entirely unable to function during the relevant time period, the family court did not find her credible. Indeed, Susan's testimony that she did not remember the relevant two-year period is undermined by her insistence that certain things did or did not occur during that time.[15] Regardless, we do not reweigh the court's credibility determinations. (*Bookout v. State of California*

---

[14] Susan testified she had signed a proposed marital settlement agreement in 2012 (during the prior dissolution proceeding), but Troy had not signed it, and Susan knew it had not been entered by the family court.

[15] In addition to Susan's insistence Katherine did not visit her as often as Katherine claimed in her declaration, Susan was adamant that other witnesses were wrong or lying when they testified Susan drove to Troy's house on Christmas day in 2014 and Susan drove herself to Katherine's graduation in May 2014.

*ex rel. Dept. of Transportation, supra,* 186 Cal.App.4th at p. 1486.)

We recognize Dr. Unger testified Susan could not have appeared in court in 2014 and 2015 because she was not capable of "sustained attention," but that opinion does not have any bearing on Susan's ability to communicate with her attorney, request an accommodation from the court (including a continuance), or understand the nature of the proceeding and that it was ongoing. The same is true for Dr. Halote's opinion that Susan had severe deficits in "activities of daily living." That may have been true, but Dr. Halote did not testify that Susan would have been unable to participate in or understand the dissolution proceeding. Moreover, we agree with the family court's finding that Dr. Halote's opinion that Susan suffered from mental incapacity during the period from November 2013 through the trial was not "convincing" because he defined mental incapacity to mean only "a severe disruption in activities of daily living," which was not sufficient to show mental incapacity under section 2122.

Moreover, with respect to Susan's daily living, the court observed that Dr. Halote did not opine Susan was unable to take care of specific daily living needs, such as her financial matters, food preparation, hygiene, childcare, or driving. The court also found Dr. Halote's opinion on Susan's medical condition was "insufficiently robust, relying so heavily on Susan's subsequent and largely uncorroborated history." "It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'" (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514; accord, *Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 652 ["The jury was certainly free to side with

28

[defense expert's] opinions and conclusions over [plaintiff's expert's]. And we are not free to reweigh this evidence."].)

Finally, as the family court highlighted in its statement of decision, Susan failed to rebut the testimony of her own expert, Dr. Ayvasian, who performed neuropsychological testing. Dr. Ayvasian opined that Susan's depression caused impairment to her attention and concentration, but it did not render her mentally incapacitated.

C.    *The Evidence Did Not Compel a Finding of Duress*

As with mental incapacity, the Family Code does not define "duress." Generally, in the context of section 2122, courts have found "'"[d]uress . . . includes whatever destroys one's free agency and constrains [him or her] to do what is against [his or her] will, and may be exercised by threats, importunity or any species of mental coercion . . . ."'" [Citation.] It is shown where a party 'intentionally used threats or pressure to induce action or nonaction to the other party's detriment. . . . The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing."' (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1523; accord, *In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 743-744 ["'"By many if not most of the modern authorities, however, the true doctrine of duress is held to be that a contract . . . obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress . . . ."'"].)

Susan contends the family court erred in failing to find duress because she presented "unrefuted evidence of domestic

violence" committed by Troy.  This evidence was far from unrefuted.  As the court noted in its statement of decision, Susan stated in her declaration and in her trial testimony that there was one incident of physical violence in 1997, which Troy denied, and there was no corroborating evidence.  Further, the court found Susan had not established Troy "engaged in stalking or coercive control."  Susan has not presented any evidence that would compel a contrary finding.

Susan argues she was subjected to duress based on Troy's threats to keep her children from her beginning in August 2013.  However, there was no testimony that Troy ever pressured Susan to cease participating in the dissolution proceeding or threatened to keep the children from her if she did not do so.  In fact, Susan filed the dissolution petition after the children had moved out of her home, which undermines any claim she was afraid to participate in the case for fear of losing her children.  Accordingly, there was no evidence on which to base a finding of duress, let alone evidence that compelled such a finding.

D.    *The Family Court Did Not Err in Failing To Set Aside the Judgment as Inequitable*

Susan argues the family court erred by failing to set aside the judgment as inequitable pursuant to section 2125, which provides, "When ruling on an action or motion to set aside a judgment, the court shall set aside only those provisions materially affected by the circumstances leading to the court's decision to grant relief.  However, the court has discretion to set aside the entire judgment, if necessary, for equitable considerations."

Susan interprets this language as empowering a court to set aside a judgment solely "for equitable considerations."  This

30

interpretation is contrary to the plain language of the statute, which requires the court to only set aside the portions of a judgment "materially affected by the circumstances leading to the court's decision to grant relief." (§ 2125.) As discussed, once six months has passed since entry of judgment, "[s]ection 2122 sets out the exclusive grounds and time limits for an action or motion to set aside a marital dissolution judgment." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684.) Further, section 2123 explicitly prohibits a court from setting aside a judgment "simply because the court finds that it was inequitable when made," or "simply because subsequent circumstances caused [it] to become inequitable." Reading these sections together, it is clear section 2125 only gives a court discretion to set aside an entire judgment based on equitable grounds once the court has already found the existence of one of the grounds to set aside the judgment under section 2122. (See *Marriage of Heggie, supra,* 99 Cal.App.4th at p. 33 ["Section 2123 is plain that where the only reason to set aside a judgment is that it was 'inequitable when made,' the trial court is affirmatively commanded not to set the judgment aside under 'any' law." (capitalization omitted)]; *In re Marriage of Rosevear*, at p. 685, fn. 11 ["Under section 2123, a trial court may not set aside a dissolution judgment on the *sole* grounds the judgment is inequitable or the support ordered is inadequate."].)

Susan does not address section 2123 in her briefs, instead relying on older cases for the proposition that a family court has "the inherent power . . . to set aside the final decree if obtained by fraud." (*Miller v. Miller* (1945) 26 Cal.2d 119, 121; accord, *Peterson v. Peterson* (1955) 135 Cal.App.2d 812, 816.) However, these cases predate the enactment of sections 2120 through 2129, and are therefore inapposite. (See *Marriage of Heggie, supra,*

31

99 Cal.App.4th at p. 33 ["Thus to whatever degree [Code of Civil Procedure] section 473 jurisprudence might have, prior to the enactment of [Family Code sections 2120 through 2129], countenanced the setting aside of a family law judgment because it was somehow 'inequitable,' that discretion has now been expressly curtailed."].)

## DISPOSITION

The family court's denial of the request for order to set aside the judgment is affirmed.  Troy is to recover his costs on appeal.


FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.